1  John S. Burton
   BURTON, SCHMAL & DiBENEDETTO, LLP
2  133 Mission Street, Suite 102
   Santa Cruz, CA  95060
3  Telephone:    (831) 425-5023
   Facsimile:    (831) 427-3159
4  jsb@bsdllp.com
5  Attorneys for Defendant, TASER International, Inc.

6  Mildred K. O'Lim, Esq., No. 159055
   MANNING & MARDER
7  KASS, ELLROD, RAMIREZ LLP
8  15th Floor at 801 Tower
   801 South Figueroa Street
9  Los Angeles, CA  90017
   Telephone:    (213) 624-6900
10 Facsimile:    (213) 624-6999
11 mko@mmker.com
   Attorneys for Defendant, TASER International, Inc.
12
   John R. Maley, Esq.
13 (Indiana State Bar No. 14300-89)
   BARNES & THORNBURG LLP
14 11 South Meridian Street
   Indianapolis, IN  46204
15 Telephone:    (317) 231-7464
16 Facsimile:    (317) 231-7433
   jmaley@btlaw.com
17 (Pro Hac Vice Pending) Attorney for Defendant, TASER International, Inc.
18
19          SUPERIOR COURT OF THE STATE OF CALIFORNIA
                 IN AND FOR THE COUNTY OF SANTA CRUZ
20
21 DAVID BUTLER as Conservator of the Person
   and Estate of Steven Alan Butler,
22              Plaintiff,                    Case No.: CV161436
23       vs.                                  DEFENDANTS' MEMORANDUM IN
                                              SUPPORT OF MOTION FOR
24 TASER INTERNATIONAL, INC.,                 SUMMARY JUDGMENT OR
   PROFORCE MARKETING, INC., and             ALTERNATIVE MOTION FOR
25 DOES 1 to 20 inclusive,                    SUMMARY ADJUDICATION
26              Defendants.                   Hearing: February 19, 2010
                                              Time: 8:30 a.m.
27                                            Dept.: 5
28
                                             **FILED BY FAX**

F I L E D
DEC - 7 2009
ALEX CALVO, CLERK
BY DEBORAH ROJAS
DEPUTY, SANTA CRUZ COUNTY

**EXHIBIT**

**G**

1  John S. Burton
   BURTON, SCHMAL & DiBENEDETTO, LLP
2  133 Mission Street, Suite 102
   Santa Cruz, CA  95060
3  Telephone:    (831) 425-5023
4  Facsimile:    (831) 427-3159
   jsb@bsdllp.com
5  Attorneys for Defendant, TASER International, Inc.

6  Mildred K. O'Linn, Esq., No. 159055
7  MANNING & MARDER
   KASS, ELLROD, RAMIREZ LLP
8  15th Floor at 801 Tower
   801 South Figueroa Street
9  Los Angeles, CA  90017
   Telephone:    (213) 624-6900
10 Facsimile:    (213) 624-6999
11 mko@mmker.com
   Attorneys for Defendant, TASER International, Inc.

12
   John R. Maley, Esq.
13 (Indiana State Bar No. 14300-89)
   BARNES & THORNBURG LLP
14 11 South Meridian Street
15 Indianapolis, IN  46204
   Telephone:    (317) 231-7464
16 Facsimile:    (317) 231-7433
   jmaley@btlaw.com
17 (*Pro Hac Vice Pending*) Attorney for Defendant, TASER International, Inc.

18
                    SUPERIOR COURT OF THE STATE OF CALIFORNIA
19                    IN AND FOR THE COUNTY OF SANTA CRUZ

20 DAVID BUTLER as Conservator of the Person
   and Estate of Steven Alan Butler,
21
                                                Case No.:  CV161436
22          Plaintiff,
                                                **DEFENDANTS' MEMORANDUM IN**
23          vs.                                 **SUPPORT OF MOTION FOR**
                                                **SUMMARY JUDGMENT OR**
24 TASER INTERNATIONAL, INC.,                   **ALTERNATIVE MOTION FOR**
   PROFORCE MARKETING, INC., and                **SUMMARY ADJUDICATION**
25 DOES 1 to 20 inclusive,
                                                **Hearing:  February 19, 2010**
26          Defendants.                         **Time:  8:30 a.m.**
                                                **Dept.:  5**
27

28

**TABLE OF CONTENTS**

I.  INTRODUCTION  .................................................................. 1

II.  SUMMARY OF UNDISPUTED MATERIAL FACTS ........................... 2

    A.  Steven Butler  ............................................................. 2

    B.  TASER  ................................................................... 2

    C.  TASER ECDs  ........................................................... 4

    D.  Watsonville Police Department's Purchase Of TASER ECD ........... 5

    E.  The State Of The Science As Of Date Of Sale -- July 2006 ............. 6

    F.  The State Of The Science As of Date Of Incident -- October 7, 2006 ............. 7

    G.  Steven Butler Is Intoxicated On Drugs And Alcohol; Incident Ensues ........... 7

    H.  Steven Butler's Treatment And Status .................................... 9

III.  DISCUSSION  ................................................................... 9

    A.  Plaintiff's Claims For Punitive Damages Fail ........................... 9

        1.  Punitive Damages Should Be Awarded Only In Exceptional Cases, Of Which This Is Not One ........................................ 9

        2.  TASER Should Not Be Deterred From Developing Products That Are Intended To Promote Public Safety ............................. 10

        3.  Defendants Did Not Act With A Willful And Conscious Disregard Of The Rights Or Safety Of Butler ....................... 11

    B.  Plaintiff's Strict Product Liability Claim Fails ......................... 12

    C.  Summary Judgment Is Appropriate On Plaintiff's Claims Of Negligence ..... 14

    D.  The TASER ECD Did Not, As A Matter Of Law, Cause Butler's Alleged Injuries ....................................................... 15

    E.  Plaintiff's Intentional Misrepresentations, Deceit, And Fraud Claims Fail .... 16

    F.  Plaintiff's Negligent Misrepresentation Claim Fails........................... 17

IV.  CONCLUSION  ................................................................ 18

1

## **TABLE OF AUTHORITIES**

2 *Cases*

3 *Anderson v. Owens-Corning Fiberglass Corp.,*
4    53 Cal. 3d 987 (Cal. 1991) ................................................................................ 12,14

5 *Bell v. Sharp Cabrillo Hospital,*
    212 Cal. App. 3d 1034 (Cal. Ct. App. 1989) ............................................................ 10
6
7 *Bell v. Swift Adhesives, Inc.*
    804 F. Supp. 1577 (S.D. Ga. 1992) ...................................................................... 16

8 *Bernhardt v. Richardson-Merrell, Inc.,*
9    723 F. Supp. 1188 (N.D. Miss. 1988), *aff'd.* 892 F.2d 440 (5th Cir. 1990) ............... 16

10 *Cadlo v. Owens-Illinois, Inc.,*
    125 Cal. App. 4th 513 (Cal. App. 2004) ................................................................ 17
11
12 *Carlin v. Superior Court,*
    13 Cal. 4th 1104 (Cal. 1996) ............................................................................... 12

13 *Colaprico v. Sun Microsystems, Inc.,*
14    758 F. Supp. 1335 (N.D. Cal. 1991) .................................................................... 17

15 *Diediker v. Peelle Financial Corp.*
    60 Cal. App. 4th 288 [70 Cal. Rptr. 2d 442] (1997) .............................................. 18
16
17 *Engalla v. Permanente Medical Group, Inc.*
    15 Cal. 4th 951 [64 Cal. Rptr. 2d 843] (1997) ..................................................... 16

18 *Fox v. Pollack*
19    181 Cal. App. 3d 954 [226 Cal. Rptr. 5320 (1986) ............................................... 17

20 *Gawara v. United States Brass Corp.,*
    63 Cal. App. 4th 1341 (Cal. Ct. App. 1998) ......................................................... 10
21
22 *Gombos v. Ashe,*
    158 Cal. App. 2d 517 (Cal. Ct. App. 1958),
23    *overruled on other grounds, Taylor v. Superior Court,* 24 Cal. 3d 890 (1979) .......... 10

24 *Hickman v. Sofa-Mor-Danek Group, Inc.,*
    1999 U.S. Dist. LEXIS 4384 (N.D. Cal. 1999) ...................................................... 15
25
26 *Lee v. California Inst. of Tech.,*
    No. CV09-320 CAS (MANx), 2009 U.S. Dist. LEXIS 59957
    (C.D. Cal. June 30, 2009) ................................................................................... 10
27
28 *Lineaweaver v. Plant Insulation Co.,*
    37 Cal. Rptr. 2d 902 (Cal. App. 1995) ................................................................. 15

*Lomax v. LVMPD*,
    574 F. Supp. 2d 1193 (D. Nev. 2008) ................................................................ 2

*Lynch v. Merrell-Nat'l Labs.*,
    830 F.2d 1190 (1st Cir. 1987) ........................................................................ 16

*McClain v. Metabolife Int'l, Inc.*,
    401 F.3d 1233 (11th Cir. 2005) ...................................................................... 15

*Mann v. TASER International*,
    No. 08-16951, ___ F.3d. ___, 2009 WL 4279713 (11th Cir. Dec. 2, 2009)................. 2

*Merrill v. Navegar, Inc.*,
    26 Cal. 4th 465 (Cal. 2001) ........................................................................... 14

*Mirkin v. Wasserman*,
    5 Cal. 4th 1082 (Cal. 1993) ........................................................................... 17

*Ohio v. U.S. Dept. of the Interior*,
    880 F.2d 432 (D.C. Cir. 1989) ....................................................................... 15

*Rosa v. City of Seaside and TASER International*,
    No. C-05-03577-JF, 2009 WL 4049842 (N.D. Cal. Nov. 20, 2009) ................. 1,13,15

*Sanderson v. Int'l Flavors & Fragrances*,
    950 F. Supp. 981 (C.D. Cal. 1996) ................................................................. 15

*Walker v. LVMPD*,
    No. 2:07-v-00740-PMP-LRL (D. Nev. 2009)....................................................... 2

**Other Authority**

California Civil Code §3294 ............................................................................. 13,14

CACI No. 1205 ............................................................................................... 16

CACI No. 1222 ............................................................................................... 18

I.     **INTRODUCTION**

This case involves 50-year-old Steven Butler, with a long history of drug and alcohol abuse, a lengthy criminal record, and a history of psychiatric illness.  On the afternoon of October 7, 2006, Butler was extremely intoxicated with a blood alcohol content of .350 and with THC (marijuana) in his system.  After an incident on a public bus with women and children in which Butler was intoxicated, profane, threatening, and would not comply with police, one officer applied three brief applications of a TASER® X26 Electronic Control Device ("ECD") powered by two 3-volt cells and another applied handcuffs.  Butler was alive and continued to resist after the first and second ECD applications.  During or shortly after the third ECD application he went into cardiac arrest, was resuscitated by first responders en route to the hospital, and is alive today though unfortunately with diminished mental capacity allegedly from the cardiac arrest.  Plaintiff has sued TASER International, Inc. ("TASER") as the manufacturer of the X26 ECD and ProForce as the distributor, alleging negligence, strict products liability, and misrepresentation claims.  Plaintiff contends -- despite the lack of supporting science at the time of shipment, the time of the incident, and even today -- that ECDs cause arrhythmia and cardiac arrest in humans and that Defendants should have warned of this.

Even taking the undisputed material facts favorably for Plaintiff, the claims fail as a matter of law.  As was similarly determined by U.S. District Judge Fogel in San Jose in *Rosa v. City of Seaside and TASER International*, No. C-05-03577-JF, 2009 WL 4049842 (N.D. Cal. Nov. 20, 2009) (summary judgment for TASER), it was not known or knowable at the time of shipment or incident in this case that a TASER ECD causes arrhythmias, ventricular fibrillation, or death in human beings (and indeed that is not known or knowable today; human research demonstrates otherwise).  Nor would a reasonably prudent manufacturer have issued

1    the warnings Plaintiff contends were necessary.  Instead, the scientific research on the effects

2    of TASER ECDs on humans demonstrates that these alternative weapons for law enforcement

3    do not cause arrhythmias, ventricular fibrillation, or death in human beings.  As has been true

4    in Watsonville, CA, and elsewhere, TASER ECDs have provided law enforcement with an

5    important tool.  Summary judgment or alternatively summary adjudication is required for

6    

7    Defendants, as outlined in more detail in this Memorandum. *Accord, Lomax v. LVMPD*, 574 F.

8    Supp. 2d 1193 (D. Nev. 2008) (granting summary judgment for TASER); *Walker v. LVMPD*,

9    No. 2:07-v-00740-PMP-LRL (D. Nev. 2009) (same); *Mann v. TASER International*, No. 08-

10    16951, __ F.3d. __, 2009 WL 4279713 (11th Cir. Dec. 2, 2009) (affirming summary judgment

11    for TASER).

12    

13    ## II.    SUMMARY OF UNDISPUTED MATERIAL FACTS

14         The undisputed material facts are set forth in detail in the accompanying Separate

15    Statement of Undisputed Material Facts.  The following is a summary of the undisputed facts.

16    **A.    Steven Butler**

17    

18         Steven Butler has lived a troubled life.   Age 50, he has a lengthy criminal record

19    including convictions for armed robbery, drunk driving, auto theft, resisting arrest, driving

20    while intoxicated on suspended license, and trafficking in stolen property. [SF1]  He has a long

21    history of illicit drug abuse, alcohol abuse, and psychiatric disorders. [SF2]  On the date in

22    question -- October 7, 2006 -- he had a blood alcohol content of .350 and had THC in his

23    system. [SF3]

24    

25    **B.    TASER**

26         Rick Smith founded TASER's predecessor in 1993 after two of his high school football

27    teammates were shot to death in an altercation that started at a traffic light in Scottsdale,

28    Arizona. [SF16]  Smith learned that firearm fatalities claim more than 30,000 lives each year

in the United States, and is one of the leading causes of death of young people. [SF16]  Smith believes the number of lives lost to violence is a national tragedy, and that new technology is a key to reducing these lives lost in the future. [SF16]  So Smith started TASER to develop newer, safer ways for people to protect themselves without taking another person's life in the process. [SF16]

TASER researches, designs, assembles, and markets ECDs that enable law enforcement, military, corrections, private security, and civilians to protect themselves while reasonably minimizing the risk of serious injury or death. [SF17]  TASER is the leading manufacturer of ECDs and has developed new technology breakthroughs and improved the technology that has existed since 1967. [SF18]  Since its founding in 1993, TASER's strategic objective has included protecting life by providing less-lethal force solutions to violent confrontation. [SF6,66]

Prior to launching its first ECD, in 1995 TASER had the medical, scientific, electrical, and engineering literature thoroughly researched and analyzed by Dr. Robert A. Stratbucker, M.D., Ph.D., P.E. [SF33]  Dr. Stratbucker was a licensed physician with board certifications and with a Ph.D. in Physiology. [SF25]  Dr. Stratbucker was the world's leading medical researcher of handheld electronic weapons in the late 1980s and 1990s. [SF26]  Dr. Stratbucker has conducted research in transthoracic cardiac pacing, magnetic pacing of the heart, bioengineering of cardiac devices, and in other areas. [SF30]  TASER also retained Dr. Stratbucker to conduct safety studies of the impulse generator module of the TASER ECD and to conduct safety studies. [SF33]  The studies showed a safety margin of error for ECDs of 30:1. [SF39]

Since then, TASER has remained proactive in safety research and testing.  For instance, since 2004, TASER has a Scientific and Medical Advisory Board ("SMAB") [SF54]

containing   world-renowned   scientists,   cardiologists,   and   electrophysiologists. [SF55,56,57,58,59]   The SMAB is chaired, for instance, by Mark Kroll, Ph.D., whose scientific specialty is electrophysiology or the interaction of electricity and the human body. [SF47,48]   Dr. Kroll's primary focus is the effect of electrical shocks on the human body. [SF48]   With over 300 issued United States patents and numerous pending and international patents, Dr. Kroll currently holds the most patents on electrical medical devices and cardiac devices of anyone in the world. [SF49]   Over one million people have medical electrical devices with Dr. Kroll's patented technology in their chests, monitoring every heartbeat [SF49].   Dr. Kroll is also on the TASER Board of Directors. [SF47]

C.     **TASER ECDs**

TASER ECDs are currently in use by more than 14,853 law enforcement agencies in the United States and in 44 countries and have become a vital tool for patrol-level deployment around the world. [SF66,270]   TASER ECDs are in the hands of more than 203,750 private citizens for self-defense. [SF271]   An estimated 1,800,000 individuals have been exposed to a TASER ECD to date. [SF67]   Scientific, medical, and law enforcement studies have shown that TASER ECDs dramatically reduce injuries to both officers and suspects, and the use of TASER technology is proven to reduce the number of law enforcement firearms shootings and the use of lethal force. [SF70]   The TASER M26™ ECD and the TASER X26 ECD are designed to, in probe deployment mode, incapacitate a person while reducing the likelihood of serious injuries or death. [SF71]

The TASER ECD delivers a small electrical charge to the human body. [SF74] Electricity does not store up in the human body. [SF75]   A TASER X26 ECD's power source consists of a battery of two 3-volt cells (Duracell® CR123), such as those used in digital cameras. [SF85]   The TASER X26 ECD delivers 19 +1/-2.5 pulses per second ("PPS").

[SF115] Each pulse delivered from a TASER X26 ECD is only 105 to 155 microseconds ($\mu$s) (or millionths of a second) in duration. [SF116] In a second of time, a TASER X26 ECD is not delivering any electrical charge to the subject for approximately 99.98% of the second. [SF117] The TASER X26 ECD has an average (one-second baseline) voltage of only 0.84 volts, with a peak loaded voltage of 1,400 to 2,520 volts, with approximately 600-volt average over the duration of the pulse. [SF93] By comparison, the typical common static electricity shock has approximately 25,000 to 40,000 volts, with some as high as 100,000 volts. [SF94] A Van de Graff generator that many children have experienced in science classes or museums can generate up to 25,000,000 volts. [SF98]

The TASER X26 ECD generates significantly less charge and energy than medical devices, such as external defibrillators or electroconvulsive therapy devices which are approved and deemed safe for medical use. [SF107] TASER ECDs deliver less electric current than many models of Transcutaneous Electronic Nerve Stimulator ("TENS") units. For example, the popular EMPI Select unit delivers up to 4.5 milliamperes ("mA") of average current, which is more than the 2.1 mA of the TASER X26. [SF108] It is very popular in Europe to use TENS units for treating angina with the electrodes placed across the cardiac silhouette. [SF108] No deaths from TENS units have been reported in the peer-reviewed medical, scientific, or electrical literature. [SF188]

**D.      Watsonville Police Department's Purchase Of TASER X26 ECD**

Watsonville Police Department decided to purchase TASER ECDS in 2005. [SF153] In doing so, Watsonville reviewed information from TASER and a local cardiologist, Dr. Mark Byrne, who is unaffiliated with TASER. [SF153] The TASER information indicated that the ECDs were safe for humans from a cardiac standpoint, as the existing science so indicated. [SF154] On July 7, 2006, Watsonville Police Department purchased the TASER

1   X26 ECD that was used on Butler on October 7, 2006. [SF152]  The X26 was shipped from

2   distributor ProForce on July 22, 2006. [SF152]  When Watsonville purchased the TASER X26

3   at issue, it was shipped with a comprehensive operators manual. [SF155]   The manual

4   contained warnings, including:

5

6       TASER® electronic control devices are weapons designed to incapacitate a
        person from a safe distance while reducing the likelihood of serious injuries or

7       death.   Though they have been found to be a safer and more effective
        alternative when used as directed to other traditional use of force tools and

8       techniques, it is important to remember that the very nature of use of force and
        physical incapacitation involves a degree of risk that someone will get hurt or

9       may even be killed due to physical exertion, unforeseen circumstances and
        individual susceptibilities. [SF155]

10

11      Watsonville Officer Iles, who applied the X26 to Butler, was trained on the X26 on two

12  separate day-long occasions.  First, in the summer of 2005, he received a full day of training.

13  [SF156]  Second, in the summer of 2006, he received another full day of training. [SF156]

14  Both training sessions were conducted by Watsonville Officer Ridgeway, who is a certified

15  TASER instructor. [SF156]   During these sessions, Officer Iles viewed an extensive

16  presentation prepared by TASER that included multiple warnings, including that in all uses of

17  force there is a degree of risk that someone will get hurt or may even be killed due to physical

18  exertion, unforeseen circumstances and individual susceptibilities.

19

20      Watsonville police have used TASER ECDs on multiple occasions and have found

21  them beneficial. [SF158]  For instance, Officer Iles has used the ECD on four or five other

22  occasions. [SF159]  Officer Iles describes one of those occasions as follows:

23

24      We were chasing three people at a school in the middle of the night, they were
        on the school, I don't know if they vandalising, breaking in.  I was assigned to

25      cover another officer who was fighting with another subject.  My chasing this
        subject, he turned, and attacked me, punched me in the head, I was able to push

26      him off and I went to my baton and striking him in the leg where he went to the
        ground, he was coming back up to fight me, and I decided to transition from the

27      baton to the Taser.  My thought process on that was I was over him, if I
        continued to hit him with the baton, I was going to injury him greatly, he was

28      going to get hurt, probably break both his arms or whatever else would happen.

I transitioned to the Taser, he got back up and attacked me again, tried to punch me, and that when I activated the Taser and took him into custody without further incident. Q. He had no ill effects? A. No ill effects. [SF159]

Officer Pisturino had used an ECD two or three times, the device had its intended effect, and assisted in what he was trying to accomplish. [SF160]  Each of these officers has received voluntary exposures of the TASER ECDs without incident. [SF161]  In the multiple uses of TASER ECDs by Watsonville police, no other issues or injuries of note have arisen; no other incidents of cardiac arrest have followed application. [SF162]

E.     The State Of The Science As Of Date Of Sale -- July 2006

Plaintiff contends that the X26 ECD caused an arrhythmia, ventricular fibrillation, leading to cardiac arrest in Butler. As of the date of manufacture, distribution, or sale of the TASER X26 ECD at issue in this matter, however, no peer-reviewed published scientific or medical literature concluded that the direct-delivered electrical charge of TASER ECDs causes ventricular fibrillation or cardiac dysrhythmia in humans. [SF163]  As of the date of manufacture, distribution, or sale of the TASER X26 ECD at issue in this matter, no peer-reviewed published scientific or medical literature concluded that TASER ECDs kill humans by whatever mechanism postulated -- aside from secondary factors such as injuries from falls or the ignition of flammable fumes or fluids from the ECD arc. [SF164]

F.     The State Of The Science As Of Date Of Incident -- October 7, 2006

As of the date of the incident in this matter (October 7, 2006), no peer-reviewed published scientific or medical literature concluded that TASER ECDs cause ventricular fibrillation or cardiac dysrhythmia in humans. [SF165]  As of the date of the incident in this matter (October 7, 2006), no peer-reviewed published scientific or medical literature concluded that the direct-delivered electrical charge of TASER ECDs kills humans by whatever mechanism postulated -- aside from secondary factors such as injuries from falls or the ignition of flammable fumes or fluids from the ECD arc. [SF166]  Indeed, even as of

1   December 1, 2009, no peer-reviewed published scientific or medical literature concludes that

2   TASER ECDs cause ventricular fibrillation or cardiac dysrhythmia in humans, [SF167], and

3   no peer-reviewed published scientific or medical literature concludes that TASER ECDs kill

4   humans by whatever mechanism postulated -- aside from secondary factors such as injuries

5   from falls or the ignition of flammable fumes or fluids from the ECD arc. [SF168]

6

7   **G.      Steven Butler Is Intoxicated On Drugs And Alcohol; Incident Ensues**

8          On October 7, 2006, Butler was severely intoxicated and went on a public bus on

9   which approximately ten other passengers including women and children were seated, the

10  driver asked Butler to leave the bus, but Butler was noncompliant. [SF238]  The bus driver

11  called the police and Watsonville police officers responded. [SF239]   Police arrived at

12  4:15 p.m. and found Butler on the back seat in a stuporous state. [SF240]  Butler responded to

13  officers with slurred speech, appearing intoxicated. [SF241]  Butler then became agitated and

14  told officers, "Well, sit down or get the fuck off." [SF242]  Butler then jumped up and took a

15  combative and fighting stance with his fists clenched and raised to shoulder level. [SF243]

16  Butler planted his legs apart, knees bent, and snarled at the officers. [SF243]

17

18         Officer Pisturino decided to try to go "hands on" with Butler to restrain him and told

19  Officer Iles to be ready with the TASER ECD. [SF244]  Officer Iles ordered Butler to turn

20  around and put his hands behind his back. [SF244]  Butler did not comply but instead

21  threatened the officer, saying, "I'll fucking deck you!" [SF245]  Officer Iles again ordered

22  Butler to turn around and put his hands behind his back, which Butler did. [SF245]  Officer

23  Pisturino then reached for Butler in an attempt to handcuff him. [SF245]  Butler quickly spun

24  around and moved his hands to the front again and Officer Pisturino pushed him away.

25  [SF269]  Butler squatted down and then raised back up, clenched his fists, and started coming

26  towards the officers. [SF246]  Officer Iles determined that Butler was going to use violence

27

28

Defendants' Memorandum in Support of Motion for Summary Judgment                              8

against them so shouted "TASER, TASER, TASER!" and pulled the trigger on his X26 for five seconds. [SF246]  The probes deployed and contacted Butler's clothes on his left torso. [SF246]

After this first application that briefly incapacitated Butler as designed, Butler remained alive, conscious, and uncooperative. [SF247]  Butler moved back up into the same fighting position and stepping towards the officers again. [SF247]  Believing that Butler was going to attack them, Officer Iles pulled the trigger for a second application of the X26, which the ECD data download recorded as an eight-second duration. [SF248]  Initially it did not appear that the ECD application was effective but it did then seem to be effective in temporarily incapacitating Butler. [SF248]  After this second application, Butler remained alive, conscious, and not limp. [SF249]  Butler was seated on the bus seat again groaning with his hands not visible in his lap. [SF249]

Butler's hands were not visible at this time and the Officers were concerned he might have a weapon. [SF250]  Officer Pisturino tried to grab Butler's hands and pull them out to handcuff him but Butler was not letting him pull his hands out and was groaning/growling. [SF250]  Butler was still actively resisting and not cooperating after the second cycle of the X26. [SF251]  Officer Pisturino then told Officer Iles that "we need to cuff under power," meaning to handcuff Butler during an ECD application. [SF252]  Iles then pulled the trigger a third time, which appeared to have the intended incapacitation effect. [SF252]  Butler was handcuffed, Officer Iles ceased the ECD application at five seconds, and Butler fell to the floor of the bus and blood was observed running down Butler's forehead. [SF253]  Officer Iles immediately looked at him and noticed that he was limp and appeared unconscious. [SF253]  Officer Iles noticed within a few seconds that Butler was not responsive, so they carried Butler off the bus and called paramedics. [SF253]  ENTs arrived quickly, Butler was noted to be in

ventricular fibrillation, and they used a defibrillator to reactivate Butler's heart. [SF254]  After five attempts over a number of minutes, Butler's heart began beating on its own again en route to the hospital. [SF254]  Butler was taken to Watsonville Community Hospital. [SF254]  At the hospital, Butler's blood alcohol level was found to be .350 and he had THC (a compound in marijuana) in his bloodstream. [SF254]

**H.    Steven Butler's Treatment And Status**

Butler was in a coma for a period of time, released, has returned to living with his parents as he did before, attends rehabilitation three times weekly, and is cared for daily by a brother who is compensated by the State for doing so. [SF255]  Butler is able to talk, walk, and carry on some conversation, but his mental status is deficient. [SF256]  He has been deemed incompetent to stand trial on the multiple charges resulting from his conduct on October 7, 2006. [SF257]

## III.    DISCUSSION

**A.    Plaintiff's Claim For Punitive Damages Fails**

> **1.    Punitive Damages Should Be Awarded Only In Exceptional Cases, Of Which This Is Not One**

Defendants are entitled to summary judgment or summary adjudication on Plaintiff's claims for punitive damages because there is no evidence that TASER or ProForce is guilty of oppression, fraud, or malice relative to Butler's cardiac arrest.   Punitive and exemplary damages are governed by California Civil Code §3294, which provides in relevant part:

> In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of punishing the defendant.

Cal. Civ. Code §3294.  "Malice" is defined as either (1) "conduct which is intended by the defendant to cause injury to the plaintiff"; or (2) "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.*

1   Given the seriousness of punitive and exemplary damages, California has adopted a

2   policy disfavoring such damages -- punitive and exemplary damages are to be awarded only in

3   the clearest of circumstances and with the greatest of caution. *See Gombos v. Ashe*, 158 Cal.

4   App. 2d 517, 526 (Cal. Ct. App. 1958), *overruled on other grounds, Taylor v. Superior Court,*

5   24 Cal. 3d 890 (1979).   "[I]n order to recover for punitive damages in the context of

6   unintentional torts, plaintiff is required to show that 'the defendant (1) knew of the (2)

7   probable injurious consequences of his conduct and (3) deliberately failed to avoid them.'" *Lee*

8   *v. California Inst. of Tech.*, No. CV09-320 CAS (MANx), 2009 U.S. Dist. LEXIS 59957, at *6

9   (C.D. Cal. June 30, 2009).   Although unintentional conduct can come within the definition of

10  malicious acts punishable by punitive damages, "it is not sufficient to show only that the

11  defendant's conduct was negligent, grossly negligent or even reckless." *See Gawara v. United*

12  *States Brass Corp.*, 63 Cal. App. 4th 1341, 1361 (Cal. Ct. App. 1998).   "There must be

13  evidence that defendant acted with knowledge of the probable dangerous consequences to

14  plaintiff's interests and deliberately failed to avoid these consequences." *Id.; see also Bell v.*

15  *Sharp Cabrillo Hospital,* 212 Cal. App. 3d 1034, 1044 (Cal. Ct. App. 1989) (punitive damages

16  can be assessed for nonintentional conduct only when the conduct constitutes a conscious

17  disregard of the rights or safety of others).

18  **2.   TASER Should Not Be Deterred From Developing Products That Are Intended To Promote Public Safety**

19  Punitive damages are inappropriate against a company like TASER whose stated

20  mission is "*to protect life* by providing safer, more effective force options and technologies."

21  Anecdotal and statistical evidence gathered by police departments and task forces that have

22  analyzed TASER ECDs effectiveness indicated that the use of TASER ECDs results in:

- Less injuries to police officers while completing arrests;
- Less injuries to persons who are resisting arrest;
- Less use of lethal force; and

1        • Less use of other force options.

2   [SF268]  Moreover, TASER ECDs are repeatedly proven safe through testing, including on

3   human volunteers in controlled, medically approved studies.  TASER ECDs have been tested

4   by TASER itself and by independent entities throughout the world.   Studies have been

5   specifically designed to determine whether TASER ECDs induce ventricular fibrillation, cause

6   cardiac electroporation or heart cell death, interfere with breathing, damage major organs, and

7   whether TASER ECDs are more dangerous if applied to an individual who is on drugs.  Time

8   and time again TASER ECDs passed these tests.  Many of these studies are easily available to

9   the public through TASER's website in an effort to educate the community and potential

10  purchasers  about  TASER  ECDs.  [*See*  http://www.taser.com/research/Pages/default.aspx.]

11  TASER has spent extraordinary amounts of time and resources in funding, conducting, and

12  analyzing the test data.  Additionally, TASER provides extensive safety, warning, and training

13  information.

14

15      3.    **Defendants Did Not Act With A Willful And Conscious Disregard
                Of The Rights Or Safety Of Butler**

16

17          There is no evidence, let alone clear and convincing evidence, that TASER or ProForce

18  acted with a willful and conscious disregard of the rights or safety of Butler.  On the contrary,

19  TASER has gone to great lengths to offer products that can be safely administered to

20  individuals, like Butler, who choose to violently confront law enforcement officers.

21  Moreover, even today there is no peer-reviewed scientific literature concluding that TASER

22  ECDs cause arrhythmias, ventricular fibrillation, or death in humans.  Because no evidence

23  exists to suggest that Defendants acted with a willful and conscious disregard of Butler's rights

24  or safety, Plaintiff's claim for punitive damages fails as a matter of law.

25

26

27

28

**B.      Plaintiff's Strict Product Liability Claim Fails**

Under California law, a defendant manufacturer, supplier, or merchant can be held strictly liable for a failure to warn only if a plaintiff proves that:

> (1) the defendant manufactured, distributed, or sold the product; (2) the product had potential risks that were known or knowable at the time of manufacture or distribution, or sale; (3) that the potential risks presented a substantial danger to users of the product; (4) that ordinary consumers would not have recognized the potential risks; (5) that the defendant failed to adequately warn of the potential risks; (6) that the plaintiff was harmed while using the product in a reasonably foreseeable way; (7) and that the lack of sufficient warnings was a substantial factor in causing the plaintiff's harm.

CACI No. 1205.   Under California law, plaintiff must prove that "the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution." *Anderson v. Owens-Corning Fiberglass Corp.*, 53 Cal. 3d 987, 1002 (Cal. 1991); *Rosa*, 2009 WL 4049842 (granting summary judgment for TASER on this standard).

Thus, to prevail on a strict liability claim, Plaintiff must prove that based on the information scientifically available to the manufacturer at the time of sale, the manufacturer's failure to warn rendered the product unsafe to its users. *See Carlin v. Superior Court,* 13 Cal. 4th 1104, 1113 (Cal. 1996).   Manufacturers may only be strictly liable for injuries caused by a failure to warn of a particular risk that was known to the scientific community at the time they manufactured and distributed the product. *Anderson*, 810 P.2d at 558 (addressing a "particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.").

Here, Plaintiff alleges that TASER failed to warn that TASER ECDs can cause arrhythmias, ventricular fibrillation, and cardiac arrest.   However, it was not generally recognized in the scientific community in 2006 -- nor has it been established since -- that

1  application of TASER ECDs to humans causes arrhythmias, ventricular fibrillation, or cardiac

2  arrest.  Indeed, as of the date of shipment, date of incident, and even today, no peer-reviewed

3  published scientific or medical literature concludes that TASER ECDs cause ventricular

4  fibrillation or cardiac dysrhythmia in humans. [SF260,165,167,163]   Nor does any peer-

5  reviewed published scientific or medical literature conclude that TASER ECDs kill humans by

6  whatever mechanism postulated -- aside from secondary factors not present here, such as

7  injuries from falls or the ignition of flammable fumes or fluids from the ECD arc. [SF164]  In

8  *Rosa*, 2009 WL 4049842, Judge Fogel concluded as a matter of law that Plaintiff --

9  

10  represented by one of the same counsel as Butler here -- could not sustain a products claim

11  because the science at time of shipment did not make it known or knowable that TASER

12  ECDs were generally recognized in the prevailing best scientific and medical knowledge to

13  

14  cause death by the theory posited by plaintiff in that case.  So it is here, for in 2006 (and today)

15  there simply is no general recognition in the prevailing best scientific and medical knowledge

16  that TASER ECDs cause arrhythmia, ventricular fibrillation, or death in humans.  The strict

17  products claim fails as a matter of law.[1]

18  

19  

20  ─────────────────────────

[1] Plaintiff may point to a new training bulletin and warning from TASER in September 2009 in which TASER has advised users to use a lower preferred target zone that would avoid applying ECDs to the chest.  This cannot be used, however, to somehow show causation or the need for a different warning in 2006.  As the training bulletin explains, the medical research on volunteer human studies indicates that ECDs are safe from a cardiac perspective, but lowering the preferred target zone has several advantages.  As TASER has explained in a Bulletin to users as to why the preferred zone has been lowered:

"The answer to this has less to do with safety and more to do with effective risk management for law enforcement agencies.  As the training bulletin points out, arrest scenarios often involve individuals who are in crisis and are at a heightened risk of serious injury or death, regardless of actions taken by law enforcement.  Also, Sudden Cardiac Arrest is a leading cause of death in the United States, and often occurs in an arrest scenario.  Should Sudden Cardiac Arrest occur in an arrest situation involving a TASER® electronic control device (ECD) discharge to the chest area -- plaintiff attorneys will likely file an excessive use of force claim against the law enforcement agency and officer and try to allege that the TASER ECD played a role in the arrest related death by causing ventricular fibrillation (VF), an arrhythmia that can be fatal without intervention.  The available research does not support this and demonstrates that while it may not

C.    **Summary Judgment Is Appropriate On Plaintiff's Claims Of Negligence**

Plaintiff also asserts a claim of negligence against TASER.  To succeed on a claim of

negligent failure to warn under California law, a plaintiff must prove that:

> (1) the defendant manufactured, distributed, or sold the product; (2) the
> defendant knew or reasonably should have known that the product was
> dangerous or was likely to be dangerous when used in a reasonably foreseeable
> manner; (3) the defendant knew or reasonably should have known that users
> would not realize the danger; (4) the defendant failed to adequately warn of the
> danger or instruct on the safe use of the product; (5) a reasonable manufacturer,
> distributor, or seller under the same or similar circumstances would have
> warned of the danger or instructed on the safe use of the product; (6) the
> plaintiff was harmed; and (7) the defendant's failure to warn or instruct was a
> substantial factor in causing the plaintiff's harm.

CACI No. 1222.  The negligence theory requires Plaintiff to prove the strict liability elements

plus what TASER knew or should have known. *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 477-

79 (Cal. 2001) ("[u]nder a negligence theory, a plaintiff must also prove 'an additional

element, namely, that the defect in the product was due to negligence of the defendant.'").

"Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or

distributor did not warn of a particular risk for reasons which fell below the acceptable

standard of care, i.e., what a reasonably prudent manufacturer would have known and warned

about." *Anderson*, 53 Cal. 3d at 1002-03.

be possible to say that an ECD could never affect the heart under any circumstances, the risk of
VF is extremely rare and would be rounded to near zero.  However, law enforcement is left
defending a lawsuit and disproving a negative, which is difficult to do.  Independent field results
indicate a risk factor of 0.25% for serious injury from use of a TASER® brand ECD -- while the
risk of affecting the heart is much lower.

By simply lowering the preferred target zone by a few inches to lower center mass, the
goal of achieving Neuro Muscular Incapacitation (NMI) can be achieved more effectively while
also improving risk management.  Additionally, it lessens the risk of shot placement into areas that
are undesirable such as the head, face, neck, and female breast.  Using this preferred targeting for
all TASER ECD handhelds, as well as the new TASER XREP™ projectile, provides a uniform
targeting pattern for the customer, consistent with other less lethal weapons, including impact
projectiles.  Also, this preferred area results in increased effectiveness by allowing the bottom
probe to affect the lower extremities such as the pelvic triangle and legs.  This ability to achieve
incapacitation while improving risk management is a best practice recommendation." [Oct. 15,
2009 Training Bulletin]

1    To prevail, Plaintiff must demonstrate that TASER acted unreasonably at the time of

2    the manufacture or design of the X26 ECD based on information available at the time and in

3    light of the foreseeable risk of injury from use of the product.  Plaintiff cannot support any

4    claim that there was a defect in the TASER ECD, nor does he offer any credible evidence that

5    TASER acted unreasonably with its warnings.  Therefore, TASER's warnings about potential

6    fatal injuries after exposure to a TASER ECD are appropriate and adequate.  No reasonable

7    fact finder could find otherwise, just as in the *Rosa* case.  Plaintiff has no viable evidence of a

8    particular risk that he can tie to Butler's injuries.  As such, Plaintiff cannot show that TASER

9    failed to take reasonable measures to warn of the potential risks of the X26 ECD which fell

10   below the acceptable standard of care.  Summary judgment or summary adjudication should be

11   granted in favor of TASER.

12

13

14   **D.    The TASER ECD Did Not, As A Matter Of Law, Cause Butler's Alleged Injuries**

15   Additionally, Plaintiff cannot show, as required by California law for all of his claims,

16   a legally attributable causal connection between a TASER ECD application and Butler's

17   alleged injuries.  To prove causation, Plaintiff "must present evidence by a competent expert

18   witness testifying to a reasonable degree of medical probability that the [X26] was a

19   substantial causal factor in [Butler's] injuries." *Hickman v. Sofa-Mor-Danek Group, Inc.*, 1999

20   U.S. Dist. LEXIS 4384, *20-21 (N.D. Cal. 1999).  Plaintiff's claims fail because, under

21   California law, no products claim can succeed unless the plaintiff can first prove that the

22   defendant's conduct was the cause in fact of the plaintiff's loss.  Plaintiff must be able to show

23   that the TASER X26 was a "substantial factor."  A force which plays only a theoretical part is

24   not a substantial factor. *Lineaweaver v. Plant Insulation Co.*, 37 Cal. Rptr. 2d 902, 905-06

25   (Cal. App. 1995).  "Mere possibility alone is insignificant to establish a *prima facie* case."

26   *Sanderson v. Int'l Flavors & Fragrances*, 950 F. Supp. 981, 984 (C.D. Cal. 1996).  Moreover,

27   temporal correlation is not the same as cause-and-effect.  Any effort to establish cause-and-

28

1    effect merely based on a temporal relationship (*i.e.*, "*post hoc ergo propter hoc*" after this,

2    therefore because of this) should fail. *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233,

3    1243 (11th Cir. 2005); *Ohio v. U.S. Dept. of the Interior*, 880 F.2d 432, 472-73 (D.C. Cir.

4    1989).

5

6         Further, to the extent that Plaintiff might cite post-sale pig studies where small

7    anesthetized non-respirating pigs were put into ventricular fibrillation "animal studies alone

8    cannot prove causation in humans." *Bell v. Swift Adhesives*, 804 F. Supp. 1577, 1579 (S.D. Ga.

9    1992); *see also Bernhardt v. Richardson-Merrell, Inc.*, 723 F. Supp. 1188, 1191 (N.D. Miss.

10    1988), *aff'd*. 892 F.2d 440 (5th Cir. 1990); *Lynch v. Merrell-Nat'l Labs.*, 830 F.2d 1190, 1194-

11    95 (1st Cir. 1987) (animal studies "singly or in combination, do not have the capability of

12    proving causation in human beings in the absence of any confirmatory . . . data"). Most

13

14    important, it remains undisputed that no peer-reviewed scientific, engineering, or medical

15    research exists that creates the necessary causal link of the application of a TASER ECD to

16    Butler's alleged cardiac arrest.  This is fatal to all of Plaintiff's claims.

17

18         Finally, two of the world's leading researchers on the human effects of ECDs, Dr. Gary

19    Vilke of San Diego and Dr. Jeffrey Ho of Minneapolis, have reviewed this matter and confirm

20    that published scientific literature does not conclude that TASER ECDs cause arrhythmia,

21    ventricular fibrillation, or death in humans, and further conclude to a reasonable degree of

22    medical certainty that the ECD applications to a severely intoxicated Stephen Butler were not a

23    substantial contributing factor leading to his arrhythmia, ventricular fibrillation, or cardiac

24    arrest. [SF262; SF265]

25

26    **E.**    **Plaintiff's Intentional Misrepresentation, Deceit, And Fraud Claims Fail**

27         Plaintiff also claims that TASER made false representations to Watsonville Police that

28    somehow harmed Butler.  The tort of deceit or fraud requires:  "'(a) misrepresentation (false

1    representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c)

2    intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.'"

3    (*Engalla v. Permanente Medical Group, Inc.*, 15 Cal. 4th 951, 974 [64 Cal. Rptr. 2d 843]

4    (1997), internal quotation marks omitted.)  TASER made no representations to Butler, so he

5    has no fraud cause of action against TASER.

6

7            Plaintiff might try to rely upon some type of indirect deception theory, but that fails as

8    Watsonville did not communicate any TASER statements to Butler nor did he rely upon them.

9    *See Cadlo v. Owens-Illinois, Inc.*, 125 Cal. App. 4th 513, 520 (Cal. App. 2004) ("a plaintiff

10   who hears a misrepresentation indirectly must still show justifiable reliance on it"; plaintiffs'

11   claim related to asbestos exposure failed because "[t]he Cadlos have not alleged that Owens-

12   Illinois made a misrepresentation about Kaylo's safety to a third party, who then

13   communicated the misrepresentation to Anthony Cadlo, let alone alleged that Cadlo relied on

14   that indirect communication.") *see also Mirkin v. Wasserman*, 5 Cal. 4th 1082 (Cal. 1993).

15

16           Additionally, Plaintiff has no evidence that TASER made any material

17   misrepresentation to Watsonville Police in any event.  Accordingly, summary judgment or

18   summary adjudication is required on the fraud, misrepresentation, and deceit claims.

19

20   **F.    Plaintiff's Negligent Misrepresentation Claim Fails**

21           Plaintiff claims Butler was harmed because TASER negligently misrepresented an

22   important fact.  "Negligent misrepresentation is a form of deceit, the elements of which consist

23   of (1) a misrepresentation of a past or existing material fact, (2) without reasonable grounds for

24   believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented,

25   (4) ignorance of the truth and justifiable reliance thereon by the party to whom the

26   misrepresentation was directed, and (5) damages." (*Fox v. Pollack*, 181 Cal. App. 3d 954, 962

27   [226 Cal. Rptr. 532] (1986).)  For a negligent misrepresentation claim, "the scope of liability .

. . is not as broad as in other fields of negligence. For one thing, only those people for whom the representation was intended may recover damages on a negligent misrepresentation theory." *Colaprico v. Sun Microsystems, Inc.*, 758 F. Supp. 1335, 1337 (N.D. Cal. 1991). The representations were made to Watsonville Police, not to Butler or other criminal suspects, and there is no evidence that the representations were intended for Butler and other criminal suspects. Plaintiff's claim fails for this reason alone.

In addition, "If defendant's belief 'is both honest and reasonable, the misrepresentation is innocent and there is no tort liability.'" (*Diediker v. Peelle Financial Corp.*, 60 Cal. App. 4th 288, 297 [70 Cal. Rptr. 2d 442] (1997), internal citations omitted.)) Here, there was no misrepresentation and no evidence of anything other than honest and reasonable belief as to the representations made to Watsonville as they were backed by scientific research and literature. The negligent misrepresentation claim fails for this reason as well.

### IV.   CONCLUSION

Defendant is entitled to summary judgment and/or adjudication.

Dated: December 4, 2009

Respectfully submitted,

Attorneys for Defendants